Bruce Lindroth, Minor, by Alban Lindroth, Father and Next Friend, Appellant, v. Walgreen Company and Knapp-Monarch Company, Appellees.

Gen. No. 43,011.

Opinion filed May 29, 1946. Rehearing denied June 12, 1946. Released for publication June 13, 1946.

RYAN, SINNOTT & MILLER, of Chicago, for appellant.

Lord, Bissell & Kadyk, of Chicago, for certain appellee.

Corwin D. Querrey and Joseph Harrow, both of Chicago, for certain other appellee.

Mr. Justice Scanlan delivered the opinion of the court.

An action brought on behalf of Bruce Lindroth, aged fourteen months at the time of the accident, against Knapp-Monarch Company, the manufacturer, and Walgreen Company, the seller, of a certain vaporizer. At the close of plaintiff's evidence the trial judge directed a verdict for both defendants and plaintiff appeals from a judgment entered upon the verdict.

Plaintiff's complaint alleges, in substance, that defendant, Knapp-Monarch Co., negligently manufactured and sold, with knowledge that it would ultimately be offered for sale to the general public, a "Kwikway" vaporizer which was defective in that it was likely to melt and set fire to nearby objects and thereby cause persons using it to be severely burned; that said defendant failed to provide any device or means by which the electric current used in its operation would be cut off or disconnected automatically before the vaporizer reached a temperature at which it would set fire to surrounding objects. The complaint alleges that Walgreen Company, the seller of the vaporizer, negligently breached its express warranty that the vaporizer was reasonably safe and fit for the purpose for which it was to be used and that the mother of the infant, who purchased the vaporizer, purchased it in reliance on said warranty.

Plaintiff strenuously contends that he proved a case against both defendants by direct and circumstantial evidence and that the action of the trial court in directing a verdict for defendants amounts to a miscarriage of justice.

" 'A motion to instruct the jury to find for the defendant is in the nature of a demurrer to the evidence, and the rule is that the evidence so demurred to, in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom, must be taken most strongly in favor of the plaintiff. The evidence is not weighed, and all contradictory evidence or explanatory circumstances must be rejected. The question presented on such motion is whether there is any evidence fairly tending to prove the plaintiff's declaration. In reviewing the action of the court of which complaint is made we do not weigh the evidence,—we can look only at that which is favorable to appellant. *Yess v. Yess,* 255 Ill. 414; *McCune v. Reynolds,* 288 id. 188; *Lloyd v. Rush,* 273 id. 489.' (*Hunter v. Troup,* 315 Ill. 293, 296-7.) " (*Rose v. City of Chicago,* 317 Ill. App. 1, 12. See, also, *Mahan v. Richardson,* 284 Ill. App. 493, 495; *Thomason v. Chicago Motor Coach Co.,* 292 Ill. App. 104, 110; *Wolever v. Curtiss Candy Co.,* 293 Ill. App. 586, 597; *Olympia Fields Club v. Bankers Indem. Ins. Co.,* 325 Ill. App. 649, 656.)

Plaintiff had the right to prove his case by direct or circumstantial evidence. In criminal as well as in civil cases a verdict may be founded on circumstances alone. See *Norkevich v. Atchison, T. & S. F. Ry. Co.,* 263 Ill. App. 1, 5, 6 (appeal denied by Supreme court, id. xiv), and cases cited therein. See, also, *Gardner v. Railway Express Agency,* 274 Ill. App. 626, 631. Other cases to the same effect might be cited if it were necessary.

Observing the rules that govern us in our consideration of this appeal, we find the following facts and circumstances in evidence: Bruce Lindroth was injured on May 8, 1940. A vaporizer is a vessel heated by electricity, which is designed to direct medicated vapor in concentrated form toward the patient. The child's mother had previously owned another vapor-

izer, somewhat smaller than the "Kwikway" vaporizer and of a different model, which had a cut-off or safety device which automatically disconnected the current when it became too hot, thus preventing overheating, with its attendant dangers. This vaporizer had been broken and the mother decided to buy another in order to treat the child, who had a cold. She went to her local Walgreen store and asked for a vaporizer, and the clerk showed her one. The vaporizer was in a cardboard box, which the clerk opened. The mother (hereinafter called Mrs. Lindroth) stated that she had never heard of the "Kwikway" brand and asked the clerk if there was a "shut-off" on it. The clerk told her that it had no shut-off, but that the vaporizer "is good for about two hours." "It holds enough water, it can't boil down." Mrs. Lindroth then asked the clerk: "'Well, are you sure it doesn't have to be watched all the time.' I said, 'I have one at home that has an automatic shut-off on it, and I have never had any trouble with it. Will this be safe to leave?' She said, 'Yes, I am sure it is safe for at least two hours.'" Mrs. Lindroth testified that she bought the vaporizer because she relied upon the statements made by the clerk; that after returning home she took Bruce into the bathroom, sponged him off, and rubbed him with camphorated oil; that before doing this she opened the box containing the vaporizer, read the directions, and tested the vaporizer. On the outside of the carton in which the vaporizer was packed appeared the words: "Quick, safe, no-flame, electrical." A circular containing directions was packed with the vaporizer and Mrs. Lindroth read it before she used the vaporizer. In the circular appears, *inter alia*, the following: "No danger from flame." After bathing Bruce Mrs. Lindroth put him to bed clad in a "snuggle bunny," a garment which fastened around the baby and was made fast to the bed. Mrs. Lindroth set the vaporizer on a stool, or doll's high-chair, which was

alongside the bed and about two feet distant from it. She then applied some medicine on the cotton pad in the spout, put the top on the vaporizer, having already filled the vaporizer with warm water up to an inch or an inch and a half from the top, in accordance with the written directions, and then connected the vaporizer with the electric current. She stood there until the vapor was coming out of the spout, saw that it was pointed in the right direction, and then left the room. After performing some household duties downstairs she went upstairs to the room where Bruce was, saw that he had just finished his orange juice and was turning over on his stomach to go to sleep. The vaporizer was then working all right. She then went downstairs and performed some household duties and talked with a Mrs. Kays, a friend. About forty-five minutes after the time that she had looked into the bedroom and saw that everything was all right, a neighbor ran over to the Lindroth home and told her that there was smoke coming out of the bedroom upstairs. Mrs. Lindroth rushed upstairs, opened the bedroom door, and discovered the bedroom in flames. The stool, or high-chair, on which the vaporizer stood was partly burned, the curtains in the room were burning, also the bed clothing, the crib and the "snuggle bunny." Plaintiff's evidence also tended to prove that within the forty-five minutes that elapsed from the time the current was applied until the fire was discovered a considerable part of the vaporizer had burned or melted away. On the bottom of the vaporizer several patent numbers appear: "Pat. Nos. 1,976,939 2,061,148." Plaintiff introduced in evidence as an exhibit a certified copy of letters patent issued by the United States Patent Office on November 17, 1936, to Knapp-Monarch Company. The certificate of the Commissioner of Patents certifies: "This Is To Certify that the annexed is a true copy from the records of this office of the Letters Patent of William H. Fischer, assignor to

Knapp-Monarch Company, *Number 2,061,148,* Granted November 17, 1936, for Improvement in Vaporizers." (Italics ours.) Attached to the certificate is a copy of the application for the proposed improvement to the vaporizer. The certificate shows that this application was filed by "William H. Fischer, St. Louis, Mo., assignor to Knapp-Monarch Company, St. Louis, Mo., a corporation of Missouri." Attached to the application is a drawing of the proposed vaporizer and specifications in reference to the same, the drawing showing the proposed cutout. The application contains, *inter alia,* the following:

"When the water W in the receptacle 12 has been completely vaporized, there is danger of overheating and damaging the heating element H. I therefore provide a thermal cutout comprising contact springs 66 and 68. These are mounted on and insulated from brackets 70 and 72 respectively which are secured to the bottom plate 20 and project upwardly therefrom. The spring 68 is of bimetal so that upon its being heated to a predetermined temperature it will warp to the dotted line position in Figure 3, thus releasing the spring 66 and allowing it to assume its dotted position, thus breaking the circuit between the free ends of the springs 66 and 68. The springs, it will be noted by referring to Figure 6, are included in series circuit with the heating element H whereby energization thereof is discontinued when the thermal cutout trips. " . . .

"The element 76 is a stop for limiting excessive movement of the button 76 inwardly. The thermal cutout is set so as to trip when the heating element H attains a temperature somewhat above the boiling point of the water so that after the water has boiled away and the heating element becomes excessively heated, it will be de-energized by the thermal cutout tripping, but the thermal cutout will not trip as long as water remains in the receptacle 12 and thereby

keeps the temperature of the heating element sufficiently low.''

Wilder A. Chapman, manager of the laboratories of the Robert W. Hunt Company, testing engineers, and a man of wide experience in testing materials and devices of all sorts, testified for plaintiff. He stated that he was familiar with vaporizers that are used to give off vapors or fumes used in the household for the purpose of treating colds or bronchitis or asthma or diseases of the throat and lungs; that he was familiar with the type of vaporizer known as Knapp-Monarch Kwikway; that a thermal cutout is a device which, by expansion, will break an electrical circuit, that the purpose is to prevent overheating of an electrically operated device; that such a device has been known to the trade for a considerable number of years before 1936; that such a device is practical in installation; that thermal electric cutouts have been used for a good many years in a variety of appliances; that ''I have used them for many years in preventing overheating of laboratory ovens which are left unattended for a considerable period of time. They are used in electric flatirons. They are used in refrigerators. And very commonly used in electrical devices to prevent overheating. From my own observation, they do prevent overheating, and they do function properly. There are a number of types of cut-outs. One very common type consists of two strips of dissimilar metals which, by expansion, are made to separate, and thereby break the circuit. . . . It is a simple attachment, a simple device, this cut-out. . . . The only time that it operates is when the water is all out of the vaporizer.''

We find nothing in the record to indicate the reason or basis for the trial court's action in directing verdicts for defendants and after a careful consideration of all the facts and circumstances we are at a loss to understand upon what theory of fact or law the trial

court based its ruling. Defendants are represented in this court by able and experienced counsel, and we have carefully considered the points raised by them in support of the trial court's action. In the briefs of defendants they have not always adhered to the settled rules that govern a motion for a directed verdict. They draw inferences from certain evidence and claim that the inferences are reasonable. These inferences are inconsistent with the inferences drawn by plaintiff from the same evidence, and defendants argue, apparently, that if their inferences are reasonable, plaintiff's inferences, even though they be reasonable, should have no weight. In *Turner v. Cummings,* 319 Ill. App. 225, the First Division of this court held that the trial court erred in directing a verdict in that case. Mr. Justice McSURELY, in a supplemental opinion on rehearing, states (pp. 228, 229):

"In the petition for rehearing filed by the receivers of the streetcar company, it is also said 'It is fundamental that an inference cannot be drawn from a fact or state of facts when an inconsistent inference may as readily be drawn from the same facts or state of facts.' There are some decisions of this court and probably others where this has been stated, but it is not the law. As we said in *Plodzien v. Segool,* 314 Ill. App. 40, the law is that where 'uncertainty arises as to the inferences that may legitimately be drawn from the evidence so that fair-minded men may honestly draw different conclusions, the question is not one of law but one of fact to be settled by the jury. *Denny v. Goldblatt,* 298 Ill. App. 325; *Chicago & N. W. Ry. Co. v. Hansen,* 166 Ill. 623; *Moore v. Rosenmond,* 238 N. Y. 356; *Kavale v. Morton Salt Co.,* 242 Ill. App. 205; *Norris v. Illinois Central R. Co.,* 88 Ill. App. 614; *Richmond & Danville R. Co. v. Powers,* 149 U. S. 43; *Cunning v. Cooley,* 281 U. S. 90; *Best v. District of Columbia,* 291 U. S. 411.' See also *Reilly v. Peterson Furniture Co.,* 314 Ill. App. 46. Note the language of

Judge Pound in the *Moore* case and of Chief Justice Hughes in the *Best* case.'' Counsel for defendants sometimes cite a certain statement of a witness and argue, apparently, that plaintiff is bound by such statement even though other and different statements were made by the witness. They sometimes resort to arguments that would be applicable if the question before us related to the weight of the evidence.

We will first take up the points urged by defendant Walgreen Company in support of the action of the trial court as to it: It contends that the complaint did not allege a breach of express warranty by Walgreen Company and that plaintiff did not rely upon such a warranty in the trial court and cannot change his theory in this court. We find no merit in this contention. Moreover, the sufficiency of the allegations of a breach of express warranty was not raised by it upon the trial, nor did it make any objection, based upon the point now raised, to the evidence introduced by plaintiff in support of the express warranty. The position of this defendant, upon the trial, was that the statements made by its saleslady were mere expressions of opinion. Had Walgreen Company upon the trial raised the point it now urges, plaintiff would have had an opportunity to amend the complaint, if his counsel deemed it necessary to do so.

Walgreen Company next contends: ''A motion to direct a verdict should be allowed if, when all the evidence is considered, with all reasonable inferences to be drawn therefrom in its aspect most favorable to the party against whom the motion is directed, there is a total failure to prove one or more necessary elements of the case.'' That this contention states a correct rule of law is not disputed. It is contended that Mrs. Lindroth knew that the vaporizer she bought did not contain an automatic shut-off. If all that the sales clerk told Mrs. Lindroth about the vaporizer was that it had no shut-off a different case would be

presented to us, but the saleslady made other and material statements, which we have heretofore stated. Walgreen Company then argues that these statements of the sales clerk were mere expressions of her opinion and not a warranty. We will refer to this argument later.

The correctness of Walgreen Company's next contention, that plaintiff offered direct evidence tending to show how Bruce's injuries occurred and therefore there is no room for the application of the doctrine of *res ipsa loquitur* in the instant case, may be conceded, but plaintiff is not obliged to rely upon that doctrine in order to make out a case against defendants.

The next contention of Walgreen Company, that it "was not the manufacturer of the vaporizer and was not liable for its design or construction," is not disputed.

Walgreen Company next contends that "the statements attributed to the clerk in the drug store at most amounted to a mere expression of opinion and did not constitute a warranty." In support of this contention defendant cites only a part of Section 12, ch. 121½, Ill. Rev. Stat. 1941 [Jones Ill. Stats. Ann. 121.16]. That section reads as follows:

"12. Definition of express warranty.] Sec. 12. Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

We cannot agree with the contention that all of the statements made by the saleslady purported to be a mere expression of her opinion. The saleslady stated that the vaporizer "is good for about two hours."

"It holds enough water, it can't boil down." These statements were direct and positive assertions. Walgreen Company strongly relies upon the fact that Mrs. Lindroth inquired of the clerk: "Have you any proof of that? What makes you say that?" to which the clerk replied that Dr. Pasco had one in his office and used it for patients when they had congestion and recommends it for them to use at home, and defendant argues that this evidence shows that Mrs. Lindroth was relying upon statements that amounted to expressions of opinion. But in another part of her examination she testified that in purchasing the vaporizer she relied upon the statements made by the saleslady. Walgreen Company's contention is based upon the assumption that if it can show certain statements of Mrs. Lindroth from which inferences favorable to it may be reasonably drawn the evidence in her favor must be rejected. It would seem hardly necessary to state that this assumption of defendant is an erroneous one. All contradictory statements, if there be any, in her evidence must be rejected upon a motion to direct a verdict.

The law bearing upon the question as to what constitutes a warranty is well settled in this State. To cite a late case, *Beckett v. F. W. Woolworth Co.*, 376 Ill. 470, 474: "It is established that no particular words or forms of expression are necessary to create an express warranty. A positive assertion of a matter of fact made by a seller at the time of the sale, for the purpose of assuring the buyer of the fact and inducing him to make the purchase, if relied on by the purchaser, constitutes a warranty. (*MacAndrews & Forbes Co. v. Mechanical Manf. Co.*, 367 Ill. 288; *Van Horn v. Stautz*, 297 id. 530; *Thorne v. McVeagh*, 75 id. 81.)"

Walgreen Company next contends that "the court properly directed a verdict for defendant Walgreen Company for the further reason that there was

no proof that defendant's clerk had authority to make any such express warranty as plaintiff claims was made by the clerk and no authority to make any such express warranty can be implied." There is force in plaintiff's argument that the instant contention, raised by a large retail business concern, shows how far that defendant will go to avoid responsibility in this case. Plaintiff is not, of course, bound by any secret arrangement between defendant Walgreen Company and its agent, the saleslady. As to the latter's authority to warrant merchandise, defendant is bound by the apparent scope of the agent's authority in its dealings with the public. See *Eckhart Carriage Co. v. Eden*, 163 Ill. App. 552, 554; *Mulhern v. Public Auto Parks, Inc.*, 296 Ill. App. 238, 243. In this last case the court stated (p. 243): "It was not necessary for plaintiff to prove actual authority. Defendant was as to plaintiff bound by the apparent authority of the attendant. In the absence of evidence tending to show the lack of authority every possible inference and intendment is in plaintiff's favor. The principal is just as much bound by authority, which through his acts he appears to give, as by that which has actually been given. (*Nash v. Classen*, 163 Ill. 409.) The scope of an agent's authority may be shown as well by circumstances as by proof of express authority. (*Springfield Engine & Threshing Co. v. Green*, 25 Ill. App. 106, 110.)" In *Smith v. Denholm & McKay Co.*, 288 Mass. 234, the plaintiff bought a jar of a preparation to be applied externally for the removal of hair. The defendant's saleswoman, in order to induce the purchase, stated that it was less painful than another brand, and was safe and harmless to use. Plaintiff developed thallium acetate poisoning from its use and brought an action against the defendant relying upon a breach of an express warranty. The trial court found that defendant's saleswoman had made affirmations of fact amounting to an express warranty and

that the plaintiff had been induced by them to make the purchase; that although the saleswoman had been instructed not to warrant goods sold by the defendant, she nevertheless had apparent authority to do so. The Supreme court sustained the trial court's findings that she did have such apparent authority. *Bruns v. Jordan Marsh Co.*, 305 Mass. 437, 26 N. E. 2d 368, was an action against the defendant for injuries sustained when the heel became detached from a shoe purchased at the defendant's store. There the court said (p. 372):

"The jury could find that the plaintiff took the shoes from the table to ascertain whether they were the correct size for her and to learn from the salesman whether they were durable, sensible and substantial; and that their selection did not become final until after they had been fitted and after she had talked with the clerk concerning their being substantial. There was evidence that the plaintiff had such a conversation with the salesman. This conversation was a part of the transaction which began with taking the shoes from the display table, the fitting of them by the clerk to the plaintiff who wanted to see not only if they were the right size but also if they were durable and substantial, and their purchase by the plaintiff. Upon such a background it was a permissible inference for the jury to draw that, before their purchase, the plaintiff had inquired of the clerk whether the shoes were durable and substantial; and the jury could further infer that he had informed her that they were, in view of the fact that she finally decided to purchase them. It was a question of fact whether such statements induced the plaintiff to purchase the shoes. There was sufficient evidence to warrant a finding that the salesman had implied authority to answer such inquiries of a customer who was contemplating the purchase of goods and that such statements of the clerk would bind the defendant. *Idzykowski v. Jordan*

*Marsh Co.*, 279 Mass. 163, 181 N. E. 172; *Smith v. Denholm & McKay Co.*, 288 Mass. 234, 192 N. E. 631.'' *Idzykowski v. Jordan Marsh Co.*, 279 Mass. 163, was a case where the defendant's salesgirl sold a white shoe cleaner to the plaintiff, saying that it was so harmless that it would not irritate the most delicate skin, that it should be applied with a sponge or cloth, and that it was a very safe substance. The Supreme court assumed that the saleslady had implied authority to make these statements because such authority was reasonably necessary to effect sales of articles like the one sold to the plaintiff, and stated that on the facts there was an implied as well as an express warranty that the cleaner was free from irritating and dangerous chemicals that would make its use unsafe. See, also, *Miller v. Economy Co.*, 228 Iowa 626; *Hercules Powder Co. v. Rich*, 3 F. 2d 12. Many other cases to the same effect might be cited if it were necessary.

Walgreen Company next contends that ''the plaintiff cannot maintain an action on a supposed express warranty to some person other than himself where he was not a party to the transaction.'' In support of this contention defendant states: ''There is no pretense that the plaintiff purchased the subject vaporizer or that any statement with reference to it was made to him. On the contrary, the truth is that plaintiff's mother, Mrs. Lindroth, purchased the vaporizer and whatever transactions were had were between her and the clerk in the drug store''; that ''no contractual relation existed between the plaintiff and the Walgreen Company.'' This contention does not appeal to our sense of justice. The suit was brought for the benefit of an infant fourteen months old, who, of course, was unable to enter into any contract. The father is a nominal plaintiff. Mrs. Lindroth stated to the clerk that she was purchasing the vaporizer to treat her child, who had a cold. Defendant cites no

case in support of its contention in which the facts were similar to the facts in the instant case. It would be a reflection upon the administration of justice if the instant contention were sustained, and we feel impelled to state that it is surprising that Walgreen Company, serving the people of Chicago in many stores, should have seen fit to advance such a defense.

After a careful consideration of the contentions raised by defendant Walgreen Company in support of the action of the trial court we are satisfied that the court committed reversible error in directing a verdict for Walgreen Company.

We will next consider the points made by Knapp-Monarch Company in support of its contention that the trial court did not err in directing a verdict for it:

Its first contention is that the doctrine of *"res ipsa loquitur* is not applicable.'' We have already held, in passing upon the same contention raised by Walgreen Company, that that doctrine does not apply to the facts of the instant case.

Knapp-Monarch Company next contends that "there was no circumstantial evidence from which it could have been reasonably inferred that the vaporizer was defective.'' In support of this contention the defendant argues that "there was no evidence that the vaporizer melted and caused the fire,'' and it makes the surprising statement that there is no evidence in the record to rebut a reasonable inference that a fire occurred in the room, not caused by the vaporizer, and that the burnt and melted condition of the vaporizer was "solely attributable to the fire.'' It is difficult to assume that this argument is seriously made. It is idle to argue that there are no facts or circumstances in the case from which a jury might reasonably infer that the fire was caused by the vaporizer. *Walgreen Company admits that the overheating of the vaporizer caused the fire,* but it insists that that result "was

caused entirely by the exhaustion of water in the vaporizer.''

Defendant next contends that the evidence does not support the claim of plaintiff that the vaporizer without a cutout was defective. The admission made in the application to the Patent Office, that when the water in the vaporizer had been completely vaporized there is danger of overheating and damaging the heating element unless the thermal cutout is used upon the vaporizer, is certainly evidence sufficient to make out a *prima facie* showing that the vaporizer was imminently dangerous, and that the result that followed at the time and place in question might reasonably have been anticipated by the manufacturer. The testimony of Mr. Chapman strongly supports the theory of fact of plaintiff that the vaporizer was imminently dangerous. In this connection it must be noted that the application to the Patent Office was made on July 16, 1935, and the patent was granted November 17, 1936. The accident happened May 8, 1940. Mr. Chapman testified that the cutout had been known to the trade for a considerable number of years before 1936. The jury also had a right to consider the condition of the vaporizer in passing upon the question as to whether or not it was imminently dangerous. Defendant contends that it is not bound by the admission made by William Fischer in the application to the Patent Office. There is no force in this contention. The records of the Patent Office show that the patent was assigned by Fischer, the inventor, to Knapp-Monarch Company and that the patent issued to defendant instead of to Fischer. Indeed, the certificate of the Patent Office shows that the application was made by ''William H. Fischer, St. Louis, Mo., assignor to Knapp-Monarch Company.'' Defendant took out the patent that was based upon the application and is bound by the statements made in the application. We find no merit in the argument of defendant that ''there

was no circumstantial evidence from which it could have been reasonably inferred that the vaporizer was defective.'' In this connection it must be noted that the vaporizer burned out, exploded or melted·upon its first usage and within forty-five minutes after it was set in operation. The vaporizer, in the condition that it was in after the fire, is before us, and we have noted its melted down and partially destroyed condition.

Defendant next contends that ''there can be no express warranty between a manufacturer and buyer.'' On the carton of the box appeared the following: ''The Kwikway to Medicated Vapors, recommended by physicians. Quick, safe, no flame, electrical, non-rusting, easily cleaned, always ready'', and on the cover of the directions appeared the following: ''All metal—unbreakable. Medicated liquid is placed in separate cup. Does not corrode inside of Vaporizer. Aluminum—will not rust. Cool wooden handle. Heats quickly, embedded genuine Nichrome element for long life. Directional, detachable spout. No danger from flame. Very economical to operate.'' In support of this contention the defendant again uses the argument that ''there is no evidence that there were any flames from the vaporizer.'' Defendant argues that ''assuming that the statements on the carton and in the circulars are warranties, which we deny, there can be no express warranty unless there is a contract between the parties.'' Defendant concedes that there are authorities that do not support its contention, but insists that the weight of authorities is in favor of the contention. It concedes that ''the manufacturer can be held, if at all, only where the wrongful act of the person sought to be held consists of a fraudulent or deceitful statement or representation. Here, plaintiff's counsel nowhere suggests a fraudulent statement, which would sustain an action for deceit. (*Davidson v. Montgomery Ward,* 171 Ill. App. 355; *Chanin v. Chevrolet Motor,* 89 Fed. (2nd) 889.)'' Defendant concedes

that Mr. Justice McSurely correctly stated the law in *Miller v. Sears, Roebuck & Co. of Illinois*, 250 Ill. App. 340, 344, wherein he said:

"Both parties rely in this court upon the decision in *Davidson v. Montgomery Ward & Co.*, 171 Ill. App. 355, where it was held that a vendor is not liable to third parties who have no contractual relation to him. This case held properly that there were three exceptions to this general rule of liability: (1) Where the act of negligence of the person sought to be held liable is with reference to some article imminently dangerous; (2) where the act of negligence consists in the manufacture or sale of an article defective in construction; and (3) where the act of negligence of the person sought to be held consists of a fraudulent or deceitful statement or representation."

In the late case of *Wintersteen v. Nat. Cooperage Co.*, 361 Ill. 95, the court said (p. 103):

"The contention is made by the defendant that it owed no duty of due care to the plaintiff, inasmuch as there was no contract between the plaintiff and the defendant. It is axiomatic that every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every wrong. This duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest or the proximity of relationship between the parties. It extends to remote and unknown persons. *Colbert v. Holland Furnace Co.*, 333 Ill. 78; *Baird v. Shipman*, 132 id. 16."

It will be noted that one of the exceptions to the general rule that a vendor is not liable to third parties who have no contractual relationship to him is *where the act of negligence of the person sought to be held liable is with reference to some article imminently*

*dangerous.* We hold that plaintiff made out a *prima facie* case showing that the vaporizer was an article imminently dangerous.

After a careful consideration of the questions involved we have reached the conclusion that plaintiff made out a *prima facie* case against Knapp-Monarch Company and that the trial court erred in directing a verdict in its favor.

The judgment order of the Superior court of Cook county entered October 8, 1943, is reversed *in toto,* and the cause is remanded for a new trial as to both defendants.

*Judgment order reversed in toto and cause remanded for a new trial as to both defendants.*

FRIEND, P. J., and SULLIVAN, J., concur.